David Marek (SBN: 290686)
The Marek Law Firm, Inc.
228 Hamilton Avenue
Palo Alto, California 94301
david@marekfirm.com
917-721-5042
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

---------------------------------------------------------------- X
ADRIAN SCOTT DUANE,                               :   **Case No.**
                                                  :
                    Plaintiff,                    :   **COMPLAINT**
                                                  :
        -against-                                 :   **JURY TRIAL DEMANDED**
                                                  :
IXL LEARNING, INC. and PAUL MISHKIN,              :
                                                  :
                    Defendants.                   :
---------------------------------------------------------------- X

Plaintiff, Adrian Scott Duane, through his attorneys, The Marek Law Firm, Inc., for his Complaint against IXL Learning, Inc. ("IXL" or the "Company") and Paul Mishkin (collectively "Defendants"), alleges as follows:[1]

## INTRODUCTION

1. Plaintiff, Adrian Scott Duane – a transgender man with an undergraduate degree from the in Mathematics from Carleton College, and a Ph.D. in Mathematics from the University of California, San Diego – worked for Defendant IXL as a product analyst. Although Duane consistently received positive feedback for his work, IXL, an online education platform, terminated his employment less than two weeks after he returned from a medical leave of absence

---

[1] Duane intends to amend this Complaint to assert additional claims under the Title I of the Americans with Disabilities Act of 1990, the Americans with Disabilities Act Amendments Act of 2008, Title VII of the Civil Rights Act of 1964, the California Fair Employment and Housing Act, and the California Family Rights Act upon receipt of of his right-to-sue letter from the EEOC.

COMPLAINT - 1

during which he had phalloplasty surgery as part of his gender confirmation. When IXL refused to accommodate his post-surgery medical needs, Duane posted on Glassdoor.com that IXL discriminated against him and others and disclosed other information about the working conditions at IXL, and he also informed his direct manager that IXL discriminated against him. Within days of Duane's assertion of his protected rights and having recently learned that Duane's medical leave was for gender confirmation surgery, IXL's CEO Paul Mishkin terminated Duane's employment because he asserted his protected rights.

### JURISDICTION

2.     This Court has jurisdiction over this action under 28 U.S.C. § 1331. The amount in controversy exceeds $75,000.

3.     The Court has personal jurisdiction over the Defendant under California Code of Civil Procedure § 410.10 and because the Defendant's actions in this state give rise to the claims at issue herein.

### VENUE

4.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2), as both parties reside in this District and a substantial part of the events giving rise to the claims occurred in this District.

### PARTIES

5.     Plaintiff Duane is a transgender man who resides in Oakland, California. He obtained his undergraduate degree in Mathematics from Carleton College in 2007, and his Ph.D. in Mathematics in June 2013 from the University of California, San Diego. He was employed by Defendant IXL in its San Mateo, California headquarters as a Product Analyst from July 10, 2013 until it unlawfully terminated his employment on January 8, 2015.

6. IXL, a Delaware corporation, is a web-based educational software company with its headquarters and principal place of business located at 777 Mariners Island Boulevard, Suite 600, in San Mateo, California. IXL employs approximately 200 employees; although most work out if its San Mateo office, many employees work remotely from locations throughout the United States.

7. Mishkin is the founder and CEO of IXL. He is a resident of California. He made the decision to terminate Duane's employment because Duane asserted his protected rights on Glassdoor.com and to his manager.

## FACTS COMMON TO ALL CAUSES OF ACTION

**A. Duane Was Qualified For His Position At IXL And Was Recognized By His Team, Supervisor, And CEO For His Outstanding Performance.**

8. Duane joined IXL in July 2013 after receiving his Ph.D. in mathematics in June 2013 from the University of California, San Diego. Duane excelled at IXL and was recognized for his outstanding performance. Duane was qualified for his position and performed his duties in a professional and competent manner throughout his employment with the Company.

9. IXL gave Duane three performance reviews over the course of his employment with the Company. Duane received his first review on September 12, 2013, after 60 days of employment at IXL from Kate Mattison. Mattison supervised Duane between July 10, 2013, and December 31, 2013. Mattison rated all aspects of Duane's performance between a 3 and 4 on a 1-5 scale, denoting performance that "consistently meets" or was "consistently above" expectations. In this review, Mattison noted that "Scott has a very positive attitude and great enthusiasm. He is willing to tackle any project and volunteers to take on new responsibilities."

10. Duane received his second performance review from Mattison after 90 days of employment with IXL on November 6, 2013. In this review, Mattison also ranked Duane's performance between a 3 and 4, indicating that his performance consistently met or was above IXL's expectations.

11. Duane received his third performance review in or around January 2014 from David Keyes, who supervised him from January 1, 2014, until IXL terminated his employment on January 8, 2015. Keyes rated all aspects of Duane's performance at a 4 or 5, and noted that Duane had improved in all areas that Mattison had outlined opportunities for growth. Keyes also praised Duane's work handling mobile device platforms, and for becoming a leader in mobile testing. As a result of this review, Keyes assigned Duane the project of designing IXL's mobile icons for precalculus so that Duane could engage in additional creative roles within the Company.

12. IXL awarded Duane two "team trophy" awards for his work. Keyes awarded Duane a "team trophy" for designing icons for the precalculus grade, which appear on IXL's iPad app. Keyes awarded Duane a second "team trophy" for his design of an innovative mobile keyboard, which was well-received by IXL's mobile software engineers.

13. IXL's CEO, Mishkin, also recognized Duane's excellent work for the Company. In August 2014, Mishkin stated that he was impressed by Duane's work designing precalculus skills in sinusoidal graphing, matching polynomial functions and graphs, writing series in sigma notation, and finding recursive formulae for sequences.

14. On or around September 2014, Mattison sent an email to Duane and Keyes praising the skills that Duane designed for the August 2014 product release.

15. Throughout his employment, IXL's Sales team used skill sets that Duane designed to market the Company's product to potential customers at conferences and other industry events.

The sinusoidal graphing skill that Duane developed was particularly popular among math teachers and school principles.

**B.   IXL Did Not Object To Duane's Flexible Schedule Before He Became Disabled.**

16.    During his January 2014 performance review and before Duane became disabled, Duane asked Keyes about his work schedule.  Duane is involved in community organizing work, and would occasionally work irregular hours—for example, by coming in at 7:00 a.m. and working until 3:30 p.m., or beginning work at 11:00 a.m. and working until 7:30 p.m.  Duane brought up this issue during his performance review because Duane wanted to ensure that keeping an irregular schedule was not a problem for Keyes or for the Company.  Keyes told Duane that his irregular hours were "absolutely fine," because Duane always got his work done and made sure not to miss any meetings.

**C.   In 2014, Duane Took Medical Leave To Have Phalloplasty Surgery.**

17.    In July 2014, Duane informed his supervisor, Keyes, that he needed to have surgery, which was scheduled to take place on November 3, 2014.  Duane also told Keyes that Duane would need to be out for between six and eight weeks to recover after the surgery.  Finally, Duane told Keyes that he would need to have weekly pre-operative appointments to prepare for his surgery.

18.    Keyes told Duane that he could work remotely on the days that he had pre-operative medical appointments.

19.    After speaking with Keyes in July 2014, Duane spoke with IXL's then-Human Resources manager, Brad Marshall, about his upcoming surgery.  Duane asked Marshall about his options for disability leave and pay.  Marshall informed Duane that he could take three months of medical leave under the California Medical Rights Act.  Marshall also told Duane that he could

only be paid for six weeks of disability—which Duane later found out was incorrect, as Duane was in fact eligible to receive up to 52 weeks of paid disability.

20.  Marshall also told Duane that he would have to cash out all of his vacation days before he could begin to take disability leave, and that Duane could not take paid sick days for the week between his last day of work and the beginning of his State Disability Insurance ("SDI") pay.

21.  IXL terminated Marshall in September 2014, one day before he and Duane were scheduled to discuss Duane's upcoming phalloplasty surgery. The Company promoted Maricela Prado to take over Human Resources. Prado is a close friend of Penner.

22.  Duane was concerned that Prado would not respect his medical privacy. In his experience, both Prado and Penner inappropriately disclosed employees' personnel issues to members of IXL who they regarded as friends.

23.  At the time that Duane needed to disclose his upcoming gender confirmation surgery to IXL, Duane was concerned that Prado would not respect his medical privacy.

24.  Before meeting with Prado, Duane spoke with Keyes about his concerns. Duane told Keyes that he was concerned with keeping his upcoming medical leave private, and that he wanted to ensure that Prado did not disclose his medical information to other employees. Keyes told Duane that he should make clear to Prado that he wanted his medical information to remain strictly confidential during their meeting. Duane emailed Prado that same day stating that his medical information should remain private.

25.  Duane's last day at work before his surgery was October 30, 2014.

**D.    IXL Refused To Reasonably Accommodate Duane's Disability.**

COMPLAINT - 6

26. On or about December 11, 2014, Duane attended the IXL holiday party with his girlfriend. Based on the reaction of his colleagues, it was apparent that his colleagues were surprised Duane, who most people believed to be a cisgender gay man, had a partner perceived to be a lesbian woman. This caused IXL employees to question his sexuality and gender identity. Because Duane has published articles on being transgender, a Google search of Plaintiff would have revealed his transgender status.

27. On Friday, December 19, Duane emailed Keyes to update Keyes as to his recovery. Duane told Keyes that he had suffered a surgical complication that made it challenging for him to be out of the house for extended periods of time. Duane told Keyes that he still planned to return to work on December 30, but asked Keyes whether he would be able to work half days in the office and half days at home as an accommodation for this surgical complication.

28. Keyes replied to Duane's email requesting a modified schedule on Monday, December 22. Keyes stated that "I would prefer that you be in the office for your hours when you come back since you are more productive here." Keyes asked whether there was anything that the Company could do to "accommodate your situation so that you can work in the office."

29. Being physically present in the office did not affect Duane's ability to perform the essential functions of his job in any manner. As a Product Analyst, Duane could perform all of the functions of his job anywhere that he could log into the IXL system—essentially, any location with a secure internet connection.

30. IXL routinely allowed other employees to work remotely even full time in order to accommodate personal and family obligations. At one point, Duane's supervisor, Keyes, informed Duane that the Company had hired at least one employee with job tasks substantially similar to Duane's with the understanding that the employee would work remotely 100% of the time.

31. Duane replied to Keyes' email on December 23, 2014. In this email, Duane made clear that he believed IXL's failure and refusal to offer him a "reasonable accommodation" constituted illegal workplace discrimination and retaliation. Duane also offered to provide written documentation from his physician regarding his disability, and noted that his physician had suggested that Duane work remotely as much as possible, especially after the complication.

32. In this email, Duane requested to work in the office for half days and work from home during the other half, which was a reasonable accommodation for his disability and would not have burdened the Company in any way.

33. Keyes immediately forwarded Duane's December 23, 2014 email to Maricela Prado and Lenore Ockerberg, IXL human resources representatives. At this time, Duane's December 23, 2014 email was also forwarded to Mishkin, and Keyes discussed Duane's allegations with Mishkin.

34. Duane submitted a note from his physician to IXL on December 29, 2014, explaining that his requested accommodation for a modified work-from-home schedule was medically necessary. This note was on the letterhead of Brownstein & Crane Surgical Services and included the website www.brownsteincrane.com. Brownstein & Crane's websites immediately identifies itself as "Gender Surgery in San Francisco." The entire website announces the medical practice's specialty of providing transgender surgeries.

35. If IXL did not know before receipt of the note from Duane's doctor that he was transgender, surely IXL knew at that time. In addition, IXL would have learned that all of the work time Duane had missed in 2014 was due to his gender reassignment surgery.

36. Duane returned to IXL on December 30, 2014. Duane met with Keyes that day. During that meeting, Keyes told Duane that another employee would be working 100% remotely

to care for his sick wife. Keyes also told Duane of another IXL employee who was on a 50% remote-work schedule because her husband lived in the District of Columbia.

37. After discussing the accommodations granted to these other IXL employees—both of whom were non-disabled, cisgender, and heterosexual—Keyes reviewed Duane's own very strict accommodations, which required that Duane be in the office at fixed hours every day and report to Keyes twice per week via email, and another two times per week in person. Duane's schedule upon returning from medical leave was very strict by the standards of other employees at IXL, nearly all of whom work flexible hours and from home, with few checkups or restrictions.

**E.   IXL Terminated Duane's Employment After Duane Complained That IXL Unlawfully Discriminated Against Him And Other Non-Conforming Employees.**

38. After his disappointing meeting with Keyes on December 30, Duane posted an anonymous review of the Company on Glassdoor.com, stating in relevant part that:

> The company isn't going anywhere right now. They play to the traditional classroom, which is good for profits. You won't have to worry about the company going under (but don't expect the profits to pass onto you, either).
>
> Don't expect a challenge working here. This company sets the bar extremely high for who they hire, and then gives their smart, talented employees boring, menial work to fill the day. The CEO is overly involved in every product, every decision, every everything.
>
> There are no politics if you fit in. If you don't—that is, if you're not a family-oriented white or Asian straight or mainstream gay person with 1.7 kids who really likes softball—then you're likely to find yourself on the outside. Treatment in the workplace, in terms of who gets flexible hours, interesting projects, praise, promotions, and a big yearly raise, is different and seems to run right along these characteristics.
>
> There is essentially no HR knowledge or staff at this company. Know your rights when you work here, because they don't, and they don't care to learn. Most management has no idea what the word "discrimination" means, nor do they seem to think it matters.

39. During Duane's employment at IXL, IXL encouraged employees to use Glassdoor – a service that IXL paid for and closely monitored – as a means to communicate with employees, potential employees, and management. For instance, by email dated February 24, 2014, Prado instructed IXL employees, including Duane, to "take a moment to login to Glassdoor.com and post some comments about your work experience." At IXL events, Mishkin had also orally instructed IXL employees to do the same.

40. As a result of IXL's direct encouragement to do so, Duane had posted a comment about IXL in the past, and he was aware that many of his colleagues reviewed IXL's Glassdoor site and posted their opinions of IXL on this site.

41. On January 6, 2015, Keyes asked to speak with Duane in Keyes' office. In this one-on-one meeting, Keyes stated that Duane seemed unhappy since returning from medical leave. Duane told Keyes that he believed IXL had "discriminated" against him in connection with his return from surgery.

42. During the January 6, 2015, meeting, Duane noted to Keyes that he had been working hard and meeting all of the goals outlined in their December 30, 2014 correspondence. Keyes agreed that Duane had met all of the goals they had discussed and stated that he noticed and appreciated Duane's work ethic and productivity.

43. After Duane outlined his grievances to Keyes, Keyes appeared receptive, and stated that he would escalate his concerns to Lenore Ockerberg, Prado's supervisor in the Human Resources Department. Keyes stated that he would keep Duane informed as to the progress of the escalation of his concerns. Keyes also apologized profusely for having discriminated against Duane.

44. Keyes told Duane, "I'm really sorry that you felt discriminated against" and that "I didn't mean to discriminate against you." He continued that, "I can totally understand why you would feel this way."

45. Keyes escalated Duane's allegations of discrimination to human resources and IXL senior management, including Mishkin. Among other things, Keyes and Mishkin had a phone call after the January 6, 2015 meeting during which Keyes informed Mishkin that Duane believed he was the victim of unlawful employment discrimination. Keyes also informed human resources of Duane's allegations.

46. Although Glassdoor posts are anonymous, IXL human resources, who found Duane's December 30 Glassdoor post, believed Duane had published this post because the complaints closely resembled the allegations of discrimination that Duane had made to Keyes on January 6. Human resources informed Mishkin, among others, that they believed Duane had authored the December 30 Glassdoor post.

47. On January 7, 2015 at 4:27 a.m., the day after his meeting with Keyes, Duane received an email from Mishkin, the CEO of IXL. Mishkin's email to Duane stated that Mishkin had heard that Duane had complaints regarding discrimination, and that Duane wanted to discuss these complaints with Mishkin. Mishkin set up to meet with Duane on January 8, 2015 at 11:00 a.m.

48. On January 7, 2015, Duane sent Keyes an email with a series of links to websites that provide information on the Americans With Disability Act, as a follow up to the allegations of discrimination that Duane had made at their meeting on January 6.

COMPLAINT - 11

49. Prior to his meeting with Duane on January 8, 2015, Mishkin decided to terminate Duane's employment and even had security pack and remove Duane's personal effects from his work area.

50. Duane met with Mishkin on January 8, 2015, under the guise of discussing Duane's concerns that IXL had discriminated against him on the basis of his disability. During this meeting, Mishkin and Duane discussed Duane's concerns regarding discrimination for approximately ten minutes. Duane told Mishkin all of his grievances, and informed Mishkin that Keyes and Prado had acted illegally after Duane returned from medical leave by refusing to grant him medically-necessary accommodations that they routinely granted to other, heterosexual, cisgender, and non-disabled employees for personal and professional reasons.

51. After a brief discussion of his disability concerns, Mishkin presented Duane with the December 30, 2014 review that Duane had posted anonymously on Glassdoor.com. Mishkin said to Duane, "I think you know what this is."

52. Mishkin appeared angry and upset about the instances of discrimination that Duane's Glassdoor post identified, and demanded evidence behind the statements that Duane had posted. Mishkin specifically asked Duane what he meant by "mainstream gay."

53. As IXL's CEO, Mishkin had access to Duane's medical records and the disability paperwork that Duane had submitted to Human Resources regarding his gender confirmation surgery. In addition, Mishkin was aware that Duane, who had been perceived as a gay, attended the Company's holiday party with a female date and that Duane had submitted a letter from his doctor who performed gender confirmation surgery.

54. Duane replied to Mishkin's questions by stating, roughly, "I'm queer, and I stick out." Mishkin asked Duane whether he felt that there was a culture of discrimination at IXL, and Duane replied, "Yes, I do."

55. According to Defendants, IXL and Mishkin terminated Duane's employment allegedly because of his Glassdoor post which included allegations of discrimination and the disclosure of other working conditions at IXL.

56. Other IXL employees had posted negative comments about IXL on Glassdoor and had not been terminated.

57. After Duane left Mishkin's office, Duane found that IXL employees had cleaned out his desk and that Human Resources had prepared the paperwork associated with his discharge from the Company. It was apparent that Mishkin had intended to terminate him before their meeting had started.

### F. The EEOC Issued A Reasonable Cause Finding That IXL Retaliated Against Duane.

58. On March 17, 2015, Duane filed a Charge of Discrimination and Retaliation with the Equal Employment Opportunity Commission ("EEOC") asserting that IXL discriminated and retaliated against Duane on the basis of his gender and disability. In his Charge, Duane asserted his rights under Title I of the Americans with Disabilities Act of 1990, the Americans with Disabilities Act Amendments Act of 2008, Title VII of the Civil Rights Act of 1964, the California Fair Employment and Housing Act, and California Family Right Act, and invoked the jurisdiction of both the DFEH and the EEOC to investigate the Charge.

59. On April 22, 2016, the EEOC, after conducting its investigation into Duane's allegations, issued its Determination, finding that "there is reasonable cause to believe that the

COMPLAINT - 13

Respondent discriminated against [Duane] in retaliation for protesting against discriminatory conduct, in violation of the statutes."

60. The EEOC has not yet issued a right-to-sue letter.

## FIRST CAUSE OF ACTION
**(Retaliation in Violation of the Family and Medical Leave Act)**

110. Duane repeats and realleges the allegations contained in paragraphs 1 through 109 as if fully set forth herein.

111. Duane is a citizen of the United States and was an "eligible employee" of Defendant IXL within the meaning of 29 U.S.C. § 2611(2)(A) at all times relevant to this action. At the time that Duane requested to take FMLA leave, he had worked for IXL for at least 12 months and had performed at least 1,250 hours of service with IXL for the previous 12-month period.

112. IXL is an "employer" within the meaning of 29 U.S.C. § 2611(4)(A) at all times relevant to this action, and employed more than 50 people within 75 miles of the worksite where Duane was employed.

113. Duane timely requested medical leave from IXL permitted under the Family and Medical Leave Act.

114. IXL treated Duane adversely because he took the leave he was entitled to under the FMLA.

115. IXL retaliated against Duane because he took an FMLA leave of absence, by, among other things, terminating his employment less than two weeks after returning from FMLA leave.

116. IXL willfully violated the FMLA.

117.     As a proximate result of IXL's retaliation against Duane on the basis of his exercise of rights under the FMLA, Duane has suffered substantial losses, including lost back pay.

118.     As a result of IXL's unlawful conduct, it is also liable for liquidated damages, interest, and attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**(Wrongful Termination In Violation Of Public Policy Against IXL and Mishkin)**

119.     Duane repeats and realleges the allegations contained in paragraphs 1 through 118 as if fully set forth herein.

120.     At all times relevant to this action, the public policy of the State of California, as codified, expressed, and mandated in California Government Code §§12900 *et seq.* is to prohibit employers from discriminating and retaliating against an individual on the basis of sex, gender identity, gender expression, disability, and decision to take protected medical leave. This public policy of the State of California is designed to protect all employees and to promote the welfare and well-being of the community at large.

121.     In addition, California Labor Code § 232.5(a) prohibits an employer from "require[ing], as a condition of employment, that an employee refrain from disclosing information about the employer's working conditions."  Section 232.5(c) prohibits an employer from terminating, or otherwise disciplining, an employee "who discloses information about the employer's working conditions."

122.     Accordingly, the actions of IXL and Mishkin in terminating Duane's employment on the grounds alleged and described herein (namely, because of his Glassdoor.com post and subsequent complaints to his manager about IXL's discrimination, retaliation, and working conditions) were wrongful and in contravention of the express public policy of the State of

California, to wit, the policy set forth in the California Fair Housing and Employment Act and the laws and regulations promulgated thereunder and/or Labor Code §§ 232.5(a) and (c).

123. As a proximate result of IXL's and Mishkin's actions described herein, Duane has suffered actual, consequential, and incidental financial losses, including without limitation loss of salary and benefits, and the intangible loss of employment-related opportunities in his field and damage to his professional reputation, all in an amount to be determined at trial.

124. Duane claims such amounts as damages pursuant to Civil Code §§ 3287 and 3288 and/or any other provisions of law providing for prejudgment interest.

125. As a proximate result of IXL's and Mishkin's wrongful acts together and separately, Duane has suffered and continues to suffer emotional distress, humiliation, mental anguish and embarrassment, as well as the manifestation of physical symptoms. Duane is informed and believes and thereupon alleges that he will continue to experience such physical and emotional suffering for a period of time in the future not presently ascertainable, all in an amount to be determined at trial.

126. The acts taken toward Duane were carried out by IXL's officers, directors, and managing agents acting in a willful, malicious, egregious, deliberate manner and in conscious disregard for Duane's rights and safety, justifying an award of punitive damages in a sum appropriate to punish Defendants and deter others in IXL's industry from engaging in similar conduct.

WHEREFORE, while reserving the right to seek additional damages as available, Duane demands judgment against Defendants as follows:

A.  On the First Claim against IXL, back pay, front pay, and employment benefits, liquidated damages, interest, and attorneys' fees and costs, plus an order enjoining IXL from engaging in the wrongful practices alleged herein, all in the maximum extent allowable by law;

B.  On the Second Claim against IXL and Mishkin, back pay, front pay, and employment benefits, interest, and attorneys' fees and costs, as well as compensatory damages including those resulting from Duane's emotional distress and mental anguish in an amount to be determined at trial;

C.  All such other and further relief as this Court deems just and proper.

Dated:          January 6, 2017

THE MAREK LAW FIRM, INC.

By:___/s/ David Marek_____
      David Marek
228 Hamilton Avenue
Palo Alto, California 94301
(917) 721-5042
david@marekfirm.com